UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET |
| VERSUS | * | NO. 05-033 |
| CARLOS MARTINEZ | * | SECTION "L" |

ORDER AND REASONS

Pending before the Court are the Defendant Carlos Martinez's Motion to Suppress Evidence and Motion to Suppress Confession. The Court heard evidence and argument on these motions on February 15, March 8, and March 13, 2006. For the following reasons, these motions are DENIED.

**I.  Factual and Procedural Background**

These two motions arise out of events leading to the arrest of Defendant Carlos Martinez on January 29, 2005. Louisiana State Police arrested Mr. Martinez after a traffic stop, and he was subsequently indicted for possession with intent to distribute cocaine hydrochloride, in violation of Title 21, United States Code, Section 841, and re-entry into the United States by an alien previously convicted of a felony, in violation of Title 8, United States Code, Section 1326.

**II.     Defendant's Motion to Suppress Evidence**

The accounts of the government and Mr. Martinez of what occurred on January 29, 2005 diverge in several important respects. The Court shall present the factual accounts of both sides before ruling on Defendant's motion.

    **a.     Government's Version of Events**

The government alleges that, on January 29, 2005, at approximately 11:24 p.m.,

-1-

Defendant Carlos Martinez was traveling eastward in a silver Cadillac on Interstate 10 in St. John Parish, Louisiana. The government states that four marked Louisiana State Police units were stopped on the shoulder of the highway on another call. The government alleges that Sargent Victor Schilleci, a Louisiana State Trooper, observed the silver Cadillac following a truck at 70 miles per hour, with less than one car length between the truck and the Cadillac. According to the government, Mr. Martinez narrowly avoided hitting the truck when the truck slowed down due to traffic. Sargent Schilleci activated the lights on his unit and signaled for Mr. Martinez to pull over.

According to the government, Sargent Schilleci approached the vehicle and spoke to Mr. Martinez. Schilleci testified that Mr. Martinez responded to his questions in a heavy accent. However, Schilleci testified that Martinez could communicate with him, and Schilleci believed that Martinez could understand what Schilleci was saying.

Mr. Martinez was accompanied by a passenger, Einna Z. Ayala-Ruberte. Schilleci testified that Mr. Martinez acknowledged that he was traveling too closely, turned over his Pennsylvania driver's license and registration, and answered questions about the circumstances of his travel. Schilleci observed that Mr. Martinez was very nervous, and his hands were shaking.

According to Schilleci, Martinez stated he was traveling from Houston to Pennsylvania to visit friends. Mr. Martinez showed Schilleci a rental agreement for the silver Cadillac, in evidence as Defendant's Exhibit 4. The rental agreement was in the names of Carlos Martinez and Leomares Vazquez, who was not present in the vehicle and who appears to be a relative of Mr. Martinez. Schilleci stated that Mr. Martinez claimed to have only had the car a few days.

Although Martinez allegedly was traveling to Pennsylvania and stated he would not return to Houston, Schilleci noted that the car was due back in Houston on February 5, six days after the event in question.

Schilleci then questioned the passenger of the vehicle, Einna Z. Ayala-Ruberte. Schilleci reported that Ms. Ayala-Ruberte stated that they were visiting sick family members, which contradicted Mr. Martinez's account. Also, Ms. Ayala-Ruberte stated she and Mr. Martinez had been married for four years, but the addresses on their drivers' licenses were different. While Schilleci was speaking with Ms. Ayala-Ruberte, Schilleci noticed two tires mounted on rims in the backseat of the silver Cadillac. According to Schilleci, Ms. Ayala-Ruberte said she knew nothing about the tires.[1]

Schilleci then alleges that he questioned Mr. Martinez again. Regarding his marriage to Ms. Ayala-Ruberte, Mr. Martinez allegedly stated that they had been married for two years, contradicting Ms. Ayala-Ruberte's statement. Regarding the tires, Mr. Martinez allegedly stated that a friend gave them to him in exchange for money that was owed. Mr. Martinez also allegedly stated that he had never been arrested before. At this point, Sargent Schilleci ran driver's license and criminal history checks on both Mr. Martinez and Ms. Ayala-Ruberte. Schilleci discovered Mr. Martinez's prior arrests for narcotics distribution and money

---

[1] Schilleci testified that he believed the tires may have been stolen and that he wanted to inspect them to determine whether the owner had engraved a serial number or social security number on the tires. At the suppression hearing, the parties introduced testimony that inscription on tires was not a common practice. However, the presence of two new tires and rims inside of a rental car was unusual, and reasonably added to Schilleci's suspicions. The Court believes that Schilleci had reasonable, articulable suspicion to stop the car and question Martinez based upon Martinez's allegedly reckless driving and inconsistent, nervous answers to questioning. Therefore, any desire that Schilleci had to inspect the tires for inscriptions was not necessary to justify Schilleci's continued questioning of Martinez, and the Court makes no finding as to whether Schilleci's suspicion was reasonable in this regard.

laundering.  Schilleci requested assistance from Trooper Midkiff.

When Trooper Midkiff arrived, Schilleci approached Mr. Martinez with a Consent to Search form and requested Mr. Martinez's consent to search the vehicle.  Schilleci alleges that Mr. Martinez stated that he could read and write in Spanish, and Schilleci testified that the Consent to Search he gave Martinez was in Spanish.  A Consent to Search form was introduced into evidence during the suppression hearing as Defendant's Exhibit 8.  This form was in Spanish and appears to be signed by Mr. Martinez.  The time listed on the Consent to Search was 11:35 p.m., eleven minutes after the initial stop.

Trooper Midkiff and Sargent Schilleci searched the silver Cadillac.  Schilleci alleges that he noticed some loose screws on the passenger side rocker panel.  Schilleci removed the screws and shined his flashlight in the cavity.  The cavity revealed a black package secured with duct tape.  Schilleci probed the package and produced white powder.  Mr. Martinez and Ms. Ayala-Ruberte were then placed under arrest.  After the search of the vehicle, troopers used a drug-sniffing dog who indicated positively for cocaine in the vehicle.

The vehicle was towed to Troop B of the Louisiana State Police.  At the station, police identified a secret compartment under the passenger side rocker panel which contained twelve packages of cocaine.  The total net weight of the cocaine was 5.7 kilograms.[2]

---

[2] The government has additionally filed a Notice of Intention to Offer 404(b) Evidence. This evidence includes Martinez's two prior traffic stops in February 2004 and January 2005.  In both stops, officers searched the interior of Martinez's vehicle and discovered hidden compartments.  In 2004, officers found $14,980 in cash in the compartment.  In 2005, the compartment apparently was empty.

The government has used these incidents to argue that Martinez was familiar with police procedure during traffic stops, and to show that trafficking through the use of hidden compartments in vehicles was Martinez's *modus operandi*.

Additionally, the government introduced at the suppression hearing a videotape of the 2004 traffic stop, Government's Exhibit 3, in order to demonstrate Martinez's understanding of

### b. Defendant's Version of Events

Mr. Martinez testified that Officer Schilleci pulled over his vehicle on Interstate 10 on the night in question, but that he was not driving recklessly. Moreover, Martinez alleges that he cannot speak English, and that he did not communicate at all with Schilleci. While Schilleci asked him questions, Martinez alleges that he did not understand what was asked. Ms. Einna Z. Ayala-Ruberte also testified and stated that she only speaks Spanish. Ms. Ayala-Ruberte maintained that Schilleci asked her questions, but that she did not understand them.

Mr. Martinez claims that Schilleci showed him a document in English, and that he did not know what it was. He stated that he did not sign any form on the night in question, and that his signature on the Consent to Search is a forgery. Martinez testified that he has no problem reading and writing Spanish, such that, if the police had given him a form in Spanish, he would have understood the form.[3]

### c. Law and Analysis

Defendant argues that the cocaine seized as a result of his traffic stop should be suppressed as evidence because it was obtained through an illegal search and seizure. The government argues that Mr. Martinez was validly detained during a routine traffic stop, and that the totality of the circumstances supported the officer's action to search the vehicle. Moreover,

---

English and his familiarity with police procedures during traffic stops. Moreover, the officer who stopped Martinez in Texas, Shaheen Moayed Pardazi, testified that he was able to understand and communicate with Martinez during the stop.

[3] Regarding the 2004 traffic stop introduced by the government, Martinez testified that, while he communicated in rudimentary English, he did not understand what Officer Pardazi was asking of him. Martinez believed that Pardazi intended only to "check" the vehicle, rather than dismantle the interior, which is what occurred during the stop. Officer Pardazi did not obtain Martinez's written consent to the search in 2004, as it was not the practice of Texas officers to do so at that time, Pardazi alleged.

the government argues that Mr. Martinez validly and voluntarily consented to the search.

      **1.**     ***Terry* stop**

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. When a search and seizure is without a warrant, as here, the government bears the burden to demonstrate that the search and seizure were constitutional. *U.S. v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005) (per curiam) (citing *U.S. v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995)). A traffic stop constitutes a seizure under the Fourth Amendment; however, this stop is permissible because it is meant to be investigatory and brief in nature. *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). A *Terry* stop is reasonable under the Fourth Amendment if 1) the officer's action was justified at its inception, and 2) the search and seizure was reasonably related in scope to the circumstances that justified the stop. *U.S. v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). "However, once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion." *U.S. v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001). The reasonableness of a *Terry* stop is a question of law. *Jaquez*, 421 U.S. at 341.

Regarding the first prong, whether the stop of Mr. Martinez was justified at its inception, the district court must determine whether the officer had reasonable suspicion to stop the defendant. *Id.* Reasonable suspicion requires some objective justification for making a stop, that is, more than a "hunch" but less than the suspicion required for probable cause. *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989). In determining whether reasonable suspicion existed, the district court must look at the totality of the circumstances, including all information available at the time the officer decided to stop the defendant. *Jaquez*, 421 U.S. at 341. The district court must

give due regard to the law enforcement officer's experience and training in making this determination.  *Brigham*, 382 F.3d at 507 (citing *U.S. v. Arvisu*, 534 U.S. 266, 273 (2002)).

The government points to the following facts that caused Sargent Schilleci to pull over Mr. Martinez's vehicle:[4]  Interstate 10 is routinely used by drug smugglers; it was late at night (11:24 p.m.); the car was an expensive rental car; Mr. Martinez was following too closely to a truck and almost caused an accident.  Sargent Schilleci's observation that Mr. Martinez was driving recklessly supported the officer's initial decision to pull over Mr. Martinez.  Thus, the first prong of the *Terry* test has been met in this case: Sargent Schilleci was justified in detaining Mr. Martinez at the inception of the stop.

Regarding the second prong, Schilleci's continued detention and search were reasonably related in scope to the circumstances that justified the stop.  The government argues that Schilleci had reasonable, articulable suspicion to detain Martinez and to obtain his consent to search the vehicle, based upon the following facts:  1) Houston, the city where their trip began, is a source city for drugs, 2) Martinez was driving an expensive rental car with two tires in the backseat, 3) Martinez allegedly said he did not know the other person who rented the car, 4) Martinez's stated plan to travel to Pennsylvania was inconsistent with the short time for which the car had been rented, 5) the passengers allegedly gave inconsistent statements about how long they had been married and why they were in Houston, 6) Martinez appeared nervous, and 7) Martinez lied about his criminal history, which the officer subsequently confirmed included drug trafficking.

---

[4] The government alleges other facts to demonstrate that Schilleci had reasonable suspicion; however, these facts only became known to Schilleci after Mr. Martinez stopped his vehicle.

Martinez alleges that he cannot speak English, and that Schilleci never communicated with Martinez's wife. However, based upon the credible testimony of Schilleci and DEA Agent Cambre, the videotape of Mr. Martinez's 2004 traffic stop in Texas, and Mr. Martinez's record of other traffic stops, the Court finds that Martinez had a sufficient understanding of what was happening during the traffic stop in this case. Moreover, in the 2004 videotape, Martinez appeared to be able to communicate in a limited way in English with the officer in that case, although his understanding of English appeared to be very poor.

The totality of the circumstances as described by Schilleci indicates that he had reasonable, articulable suspicion to detain Martinez and to obtain Martinez's consent to search the vehicle. Martinez was traveling in a rental car, not rented by Martinez, from a city known as a source for drugs, Houston, along a known drug corridor, Interstate 10. Martinez was traveling at night (11:24 p.m.) and driving recklessly, according to Schilleci. Moreover, the officer's look inside the car revealed two tires mounted on rims in the backseat, which is unusual inside of a rental car. None of these facts depended upon Martinez's understanding of English, and all of them justified Schilleci's reasonable, articulable suspicion. Also, when questioned, Martinez appeared nervous and gave answers that were either untrue (regarding his prior convictions) or inconsistent (with his wife's statements and with the rental agreement on the vehicle). Moreover, Schilleci obtained Martinez's consent to the search eleven minutes after the initial traffic stop. This was a reasonable length of time in which Schilleci could investigate his suspicions. Therefore, because of Schilleci's reasonable, articulable suspicion, Martinez was not unlawfully detained prior to the search of his vehicle. The second prong of the *Terry* analysis has been met.

### b. Consent to search the vehicle

The parties appear to agree that the central issue regarding Defendant's Motion to Suppress Evidence is whether the Consent to Search given by Schilleci to Martinez was valid. If the Consent to Search was invalid, the evidence obtained in the search would be suppressed because no exceptions to the Fourth Amendment's requirement of a warrant prior to search would apply to this case.[5]

The Fourth Amendment requires that a defendant must voluntarily give his or her consent to search for the consent to be valid. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (establishing a test of voluntariness for consent to search under the Fourth Amendment; looking at the totality of the circumstances including the presence of duress or coercion). The district court generally looks at six factors to determine the voluntariness of consent to search: 1) the

---

[5] The plain view exception would not apply because the tires inside the car were not in and of themselves evidence of criminal activity. *See Texas v. Brown*, 460 U.S. 730, 741-42 (1983). The automobile exception would not apply because Schilleci lacked probable cause at the time of the search. *See California v. Carney*, 471 U.S. 386, 392 (1985); *U.S. v. Ervin*, 907 F.2d 1534, 1539 (5th Cir. 1990).

Neither side argues that Martinez was under arrest at the time Schilleci attempted to obtain his consent to search the vehicle. Moreover, although a formal arrest is not required prior to a search incident to arrest, probable cause must exist prior to the search, and cannot be gained through evidence gathered in the search. *Smith v. Ohio*, 494 U.S. 541, 543 (1990) (per curiam); *Sibron v. New York*, 392 U.S. 40, 63 (1968). Additionally, the search incident to arrest only includes a search of the person and the area within the person's immediate control, *Smith*, 494 U.S. at 543, and the rocker panel in which Schilleci found the cocaine would not qualify as within Martinez's immediate control. Therefore, the exception of a search incident to arrest would not apply.

Also, the officer's use of a drug dog to sniff the Cadillac did not justify the initial search, as it occurred after the search. *See U.S. v. Duffaut*, 314 F.3d 203, 208 (5th Cir. 2002). Moreover, the dog sniff does not qualify as a Fourth Amendment search. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Therefore, the sniff would not trigger either the independent source doctrine or inevitable discovery doctrine. *See Murray v. U.S.*, 487 U.S. 533, 537 (1988) (independent source); *U.S. v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000) (same); *U.S. v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001) (inevitable discovery).

voluntariness of the defendant's custodial status, 2) the presence of coercive police procedures, 3) the extent and level of the defendant's cooperation, 4) the defendant's awareness of his right to refuse consent, 5) the defendant's education and intelligence, and 6) the defendant's belief that no incriminating evidence will be found.  *U.S. v. Rico*, 51 F.3d 495, 507-08 (5th Cir. 1995) (quoting *U.S. v. Richard*, 994 F.2d 244, 250-51 (5th Cir. 1993)).  No single factor is dispositive.  *Id.*

The primary question regarding Martinez's Consent to Search is his ability to understand English.  At the suppression hearing, Martinez testified that he can read and write in Spanish.  Schilleci testified that he gave Martinez a Consent to Search form in Spanish.  A Consent to Search form in Spanish bearing Martinez's signature was submitted into evidence as Defendant's Exhibit 8.  Martinez alleges that he received a form in English and that he did not sign the form: he argues that the Consent to Search form in evidence is a forgery.  Moreover, Martinez alleges that he did not understand what he was signing and that he would not have agreed to allow the officer to take apart his vehicle.

From the 2004 videotape entered into evidence and from Schilleci's testimony, the Court believes that Martinez had very little proficiency in English, but that he knew what Schilleci was saying because of his experience with law enforcement on other similar stops.  In other cases, police officers have avoided language barriers by having the defendant read the Consent to Search form aloud prior to signing it.  *See, e.g., U.S. v. Chavez-Valenzuela*, 268 F.3d 719, 722 (9th Cir. 2001) (although officer could not speak Spanish, officer required defendant to read Consent to Search form aloud in Spanish); *U.S. v. Bustillos-Munoz*, 235 F.3d 505, 508 (10th Cir. 2000) (same).  In still other cases, to avoid language problems, police officers have called in for

backup to arrange for a Spanish-speaking officer.  *See, e.g., U.S. v. DeJesus-Batres*, 410 F.3d 154, 158 (5th Cir. 2005) (officer waited for a Spanish-speaking officer to arrive prior to questioning).  It is unclear why, if he was having trouble communicating with Martinez, Schilleci took no steps to correct this problem – either by calling in for backup or having Martinez read the consent form aloud.

In any event, Martinez's signature on the Spanish Consent to Search appears to be valid.  Martinez acknowledges that he reads and writes in Spanish.  The signature on the Consent to Search form bears a striking resemblance to the signatures on his driver's license and green card – signatures that Martinez acknowledges as his own.  The signature on the Consent also closely resembles Martinez's signature on the financial affidavit that was signed before a federal magistrate judge during his initial appearance in this case – which Martinez claims was also forged.  Moreover, Martinez has been stopped on numerous occasions, including one stop just two weeks prior to this event, in which police officers sought his consent and proceeded to take apart his vehicle in search of secret compartments.  The Court believes that Martinez was familiar enough with the scope of a police search of a vehicle to know what was going on, to understand the officer's request, and to know that he had the right to refuse consent.  Because the Court finds that the Consent to Search in Spanish was valid, Defendant's Motion to Suppress Evidence is DENIED.

## III.    Defendant's Motion to Suppress Confession

Again, the accounts of the government and Mr. Martinez diverge significantly regarding what occurred after Martinez's arrest.  The Court summarizes the different versions of events.

### a.     Government's Version of Events

After the Defendant's arrest, the government alleges that he and Ms. Ayala-Ruberte were transported briefly to a state correctional facility in St. John the Baptist Parish, Louisiana. Martinez was then taken to the Troop B Substation of the Louisiana State Police in Kenner, Louisiana.  The government states that Martinez was advised of his *Miranda* rights at the time he was arrested.  A Right of Arrestee form was admitted into evidence during the suppression hearing as Defendant's Exhibit 2. This document is in Spanish, informs the defendant of his *Miranda* rights, and bears the signature of Carlos Martinez, according to the government.  The time listed on the Right of Arrestee form is 1:06 a.m., and the address is 2101 N. I-10 Service Road, which is the address of Troop B of the Louisiana State Police.  Mr. Martinez did not sign the portion of the form which waives the Defendant's *Miranda* rights.

According to the government, at approximately 3:00 a.m., two DEA agents, Agent William Cambre and Agent Reinaldo Suarez, interviewed Mr. Martinez.  Mr. Cambre testified that he informed Martinez of his *Miranda* rights in English.  The government alleges that Task Force Agent Reinaldo Suarez conducted the interrogation in Spanish, and that Mr. Suarez advised Mr. Martinez of his *Miranda* rights in Spanish prior to questioning. The government alleges that during the interview Mr. Martinez admitted to picking up the cocaine, renting the car, taking the car to a location to have the compartment built inside, and knowing that the compartment was filled with cocaine.  The government further alleges that Mr. Martinez informed them that this was his third cocaine transportation trip between Houston and Pennsylvania.   The government further alleges that the agents indicated that Martinez could receive a lighter sentence if he cooperated in their investigation, but that no threats or promises

were made.  There is no recording of Mr. Martinez's interrogation.

      **b.**      **Defendant's Version of Events**

Mr. Martinez states that he was transported to the St. John Parish jail, where he was detained from approximately 12:00 p.m. to 3:00 or 4:00 a.m.  Mr. Martinez testified that a man he calls a "mechanic," based upon the man's clothing, questioned him in Spanish at the St. John Parish prison in the presence of an African-American officer.  Mr. Martinez claims that no *Miranda* warnings were given prior to this questioning.  Mr. Martinez alleges that he repeatedly told the mechanic he knew nothing, but that the mechanic told him no one would believe him and that he should cooperate.[6]

At 3:00 or 4:00 a.m., Martinez alleges that the African-American officer transported him in a Jeep or Durango to Troop B in Kenner, Louisiana.  Mr. Martinez further alleges that at 3:00 a.m., two DEA agents arrived and questioned him about the cocaine.  Mr. Martinez alleges that he was not advised of his *Miranda* rights at this time.  Martinez alleges that he never received the Right of Arrestee form admitted in evidence, and that his signature of the form is a forgery. Mr. Martinez alleges that the DEA agents informed him that, if he told them everything he knew, that they would allow him to cooperate in the investigation by participating in a controlled delivery.  According to Martinez, the agents promised that Ms. Ayala-Ruberte would not be charged if he cooperated.  Martinez further testified that he made up a false story that he told the DEA agents in order to trick them.

---

[6] The government does not respond to Martinez's account of the mechanic.  It is doubtful if this encounter took place.  Because of the government's silence on this issue, the Court must accept Martinez's uncontroverted testimony of this event.

### c.      Law and Analysis

Martinez argues that his confession should be suppressed as "fruit of the poisonous tree" and because he did not properly waive his *Miranda* rights.  The government alleges that Martinez was rightfully arrested for the cocaine found in his vehicle, and that he voluntarily waived his *Miranda* rights after he received the rights in writing and after an agent advised him of those rights in Spanish.

The doctrine of "fruit of the poisonous tree" holds that all evidence obtained from an illegal search or seizure must be suppressed, unless the government can show a break in the chain of events sufficient to refute the inference that the information was the product of a Fourth Amendment violation.  *Ward v. Dretke*, 420 F.3d 479, 488 (5th Cir. 2005).  The test is whether the information was obtained by exploiting the initial illegal search:  if the information was obtained through exploiting the initial search, the information should be suppressed.  *Id.* Because the Court finds that the search in this case was valid, the "fruit of the poisonous tree" doctrine does not apply.

The Court must still determine whether Martinez was given his *Miranda* rights and whether he validly waived those rights.  A person must be advised of his rights at any time when that person is taken into custody or otherwise deprived of his freedom and is subject to questioning.  *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The right to receive the *Miranda* warnings attaches when the defendant is in custody and subject to interrogation, that is, either when the defendant is formally arrested or when he is deprived of freedom of movement in such a way that would constitute a formal arrest.  *Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2005). After the *Miranda* warnings have been given, the person may knowingly and intelligently waive

these rights and agree to answer questions. *Miranda,* 384 U.S. at 479.

The government bears the burden of demonstrating that the *Miranda* warnings were validly given and that the defendant validly waived his right against self-incrimination. *U.S. v. Rico*, 51 F.3d 495, 507 (5th Cir. 1995). The district court determines the voluntariness of the defendant's waiver by looking at the totality of the circumstances for two elements: 1) whether the waiver was an act of free and rational choice, without coercion, and 2) whether the waiver was made with an awareness of its consequences. *U.S. v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005) (citing *U.S. v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)).

The Court finds that Martinez was advised of his *Miranda* rights. The Right of Arrestee form, like the Consent to Search form, is in Spanish, and Martinez has testified that he can read and write in Spanish. Although Martinez argues that his signature is a forgery, it also bears a close resemblance to signatures Martinez acknowledges as his own. Moreover, the form indicates that Martinez received the warnings at 1:06 a.m., about an hour after Martinez was taken into custody.[7] Additionally, the Court finds credible the testimony of Agent Cambre that Martinez was advised of his rights again in English and Spanish prior to questioning at 3:00 a.m.

The Court notes that Martinez's testimony about the mechanic in St. John Parish indicates that a *Miranda* violation took place in this case. Although in Defendant's Exhibit 9 Sargent Schilleci reported that he gave Martinez *Miranda* warnings at the time of his arrest,

---

[7] There is a time discrepancy between Martinez's account and the Right of Arrestee form. Martinez testified that he was held in St. John Parish for about 3 hours, between 12:00 p.m. and 3:00 a.m., before being transported to Troop B. However, according to Schilleci, Martinez was brought to Troop B relatively quickly because that was the only location at which law enforcement could extract the cocaine from the secret compartment in the vehicle. The Right of Arrestee form administered at Troop B at 1:06 a.m. supports the view that Martinez was brought quickly to Troop B.

Schilleci testified that he cannot speak Spanish.[8] The warnings were given in English. Thus, because he did not understand these warnings, Martinez did not properly receive *Miranda* warnings prior to his interview in St. John Parish. *See Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("Failure to administer *Miranda* warnings creates a presumption of compulsion"). Additionally, the mechanic's conversation with Martinez was clearly "custodial interrogation" within the meaning of *Miranda* because Martinez was under formal arrest and because the mechanic's remarks were intended to elicit incriminating statements from Martinez. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Martinez testified that he understood the mechanic to be translating on behalf of the law enforcement officer in the room. *Miranda* warnings should have been administered in Spanish prior to this conversation, and there is no evidence that those warnings occurred properly in St. John Parish.

However, a prior *Miranda* violation does not taint a later confession if proper *Miranda* warnings are administered prior to the confession and if the totality of the circumstances do not indicate the presence of coercion. *Elstad*, 470 U.S. at 309-10. To determine the coercive impact of the prior *Miranda* violation, a court considers factors like "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators[.]" *Id.* at 310.

After considering these factors, the Court finds that any prior coercion Martinez may have felt was dispelled once Martinez arrived at Troop B. The DEA agents' interview occurred

---

[8] During the suppression hearing, the Defendant introduced Defendant's Exhibit 6, the DEA's Report of Investigation in this case. The report states that Schilleci advised Martinez of his rights in Spanish prior to the search of the vehicle. Contrary to Defendant's argument, the Court believes this is a reference to the Consent to Search form, which was in Spanish. Schilleci testified that he cannot speak Spanish and could not have advised Martinez of his *Miranda* rights in Spanish.

several hours later in a different location by different law enforcement officers. Also, at Troop B, Martinez received a written Rights of Arrestee form in Spanish, a form which he apparently signed. Also, Martinez was orally advised of his rights in Spanish by Agent Suarez prior to his confession. Moreover, as the government points out, Martinez has validly waived his *Miranda* rights at least once before in 2001 for the crime for which he was deported. Thus, Martinez was advised of his rights prior to his confession and was reasonably aware of the consequences of the waiver of his rights. The Court finds that Martinez received and validly waived his *Miranda* rights prior to his confession in this case.

Additionally, although Martinez testified that the DEA agents informed him that his cooperation could result in lesser charges or in exoneration of Ms. Ayala-Ruberte, this is not tantamount to coercion. A confession is not involuntary merely because of promises of leniency in connection with cooperation with law enforcement. *U.S. v. Santiago*, 410 F.3d 193, 202 (5th Cir. 2005) (quoting *U.S. v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990)).

Because the Court finds that Martinez validly received and waived his *Miranda* rights, Defendant's Motion to Suppress Confession is DENIED.

## IV. Conclusion

Accordingly, Defendant's Motion to Suppress Evidence and Motion to Suppress Confession are hereby DENIED.

New Orleans, Louisiana, this __4th__ day of April, 2006.

                                                                                    _____
                                                                                    UNITED STATES DISTRICT JUDGE